BOLIN, Justice.
 

 The Montgomery County Department of Human Resources (“the County DHR”) and the Alabama Department of Human Resources (“the State DHR”) (hereinafter referred to collectively as “DHR”) and the Department of Mental Health and Mental
 
 *42
 
 Retardation (“DMH”) request both a writ of certiorari and a writ of mandamus.
 

 Facts and Procedural History
 

 D.R.S. is deaf and mentally retarded. She also suffers from diabetes, mental illness, and alopecia. The record indicates that the juvenile court has exercised jurisdiction over D.R.S. for a number of years. During some of those yeai's, D.R.S. was in the legal custody of various relatives. The most recent proceedings involving D.R.S. began on May 23, 2007, when the County DHR petitioned the juvenile court to find that D.R.S., who was then in the legal custody of her paternal aunt, was dependent and to award custody of D.R.S. to the County DHR. Upon the filing of the County DHR’s petition, the juvenile court appointed an attorney to serve as D.R.S.’s guardian ad litem. On May 30, 2007, following an expedited hearing, the juvenile court found that D.R.S. was dependent and granted the County DHR legal custody of D.R.S.
 

 The County DHR made arrangements for D.R.S. to reside temporarily at the National Deaf Academy in Florida (“the NDA”) while it sought joint-agency funding from the “State Multiple Needs Team” for a long-term placement for D.R.S. On June 15, 2007, the juvenile court entered an order requiring the County DHR to give the juvenile court 30 days’ written notice of any proposed change in D.R.S.’s placement.
 

 On June 22, 2007, the State DHR, acting on behalf of the County DHR, notified the juvenile court in writing of the County DHR’s intent to change D.R.S.’s placement from the NDA to BayPointe Children’s Residential Services (“BayPointe”) in Mobile, Alabama, and moved the juvenile court to amend its June 15, 2007, order to allow the change in placement to take place immediately. As grounds for seeking the immediate change in placement, the State DHR alleged that Bay-Pointe could provide services that were equivalent to those being provided by the NDA; that the State Multiple Needs Team had approved joint-agency funding for residential placement of D.R.S. at Bay-Pointe at a cost not to exceed $435 per day from the date of admission through September 30, 2007; and that BayPointe then had a space available for D.R.S. but might not have space available at a later date. The motion was accompanied by a brief asserting that the juvenile court lacked authority to condition D.R.S.’s placement on the juvenile court’s prior approval; that the constitutional doctrine of separation of powers prohibited the juvenile court from preventing D.R.S.’s placement at Bay-Pointe; that the juvenile court lacked the authority to control the expenditure of State funds by directing that State agencies place D.R.S. at a particular facility; that the juvenile court lacked the authority to require State agencies to incur the cost of providing care for a child at a private facility; and that the counties of the State are statutorily responsible for the care of indigent children under the supervision of a juvenile court.
 

 An entry made by the juvenile court on the case-action summary on June 26, 2007, indicates that on that date the juvenile court held a hearing on the State DHR’s motion to amend the juvenile court’s June 15, 2007, order and found that it was not in D.R.S.’s best interest to be moved from the NDA.
 

 On July 27, 2007, the guardian ad litem moved the juvenile court to find the County DHR in contempt. As grounds, the guardian ad litem alleged, among other things, (1) that the County DHR had moved D.R.S. to BayPointe on July 25, 2007; (2) that, contrary to the State DHR’s representations to the juvenile
 
 *43
 
 court, BayPointe did not provide services that were equivalent to those provided by the NDA; and (3) that BayPointe was an unsuitable placement for D.R.S. The County DHR denied the allegations in the guardian ad litem’s motion.
 

 After a hearing, the juvenile court entered the following order on November 13, 2007:
 

 “This matter came before the Court for a review of placement of the minor child by the Montgomery County Department of Human Resources. Custody of the minor child, [D.R.S.], age 17, was vested in Montgomery County DHR and the matter is ongoing as to placement of the child, safety and stability, medical treatment and education. At the time and date set for the hearing, the following persons were present: The minor child, [D.R.S.]; Guardian ad Li-tem, Hon. Beverly Howard; Hon. Andrea Mixson, representing the minor child; the Hon. James Long, representing the State Department of Human Resources in substitution for the Montgomery County Department of Human Resources attorney; Hon. Lisa Melvin, Attorney for the Montgomery County Department of Human Resources; Hon. John Wible, Attorney for the Alabama Department of Public Health; Hon. Tamara Pharrams, representing the Alabama Department of Mental Health and Mental Retardation; Hon. Tim Tyler, Montgomery County District Attorney’s Office; Hon. Gene Spencer, the child’s defense attorney (for day one of the hearing only); Hon. Dudley Perry, representing the Alabama Department of Youth Services (for day one of the hearing only); and Hon. Barney March, attorney for BayPointe (day two of the hearing only). Also present for the hearing were Ms. Liz Hill, Alabama Department of Mental Health and Mental Retardation; Mr. Fred Vrgora, probation officer for the minor child; Ms. Beverly Wise, probation supervisor for Montgomery County Juvenile Court; Ms. Sue Parker, Montgomery County Department of Human Resources; Ms. Ruthie Fitzpatrick, Montgomery County Department of Human Resources; Ms. Margaret Bonham, State Department of Human Resources; Ms. Beth Williams, Montgomery County Department of Human Resources; and Ms. Jody Jernigan and Ms. Wendy Darling, American Sign Language interpreters.
 

 “The Court heard testimony ore tenus over a two-day period and entered certain exhibits. The purpose of this two-day hearing was to review and determine whether or not the unilateral decision made by the Department of Human Resources to place [D.R.S.] at Bay-Pointe in Mobile, Alabama was a viable placement under the facts and circumstances surrounding this case. At all times pertinent, custody of [D.R.S.] has been vested in DHR.
 

 “The record reflects that [D.R.S.] has been previously determined to be mentally ill, has been diagnosed as mentally retarded, is deaf, communicates primarily by sign language, is diabetic and suffers from alopecia in addition to other medical problems. She came to the attention of this Court through a criminal charge for a misdemeanor. It appears that the basis for [D.R.S.’s] criminal charge was for her acting-out behavior in a DHR placement. [D.R.S.] had been placed by DHR in a facility where staff members were unable to communicate with her by sign language and she had no peers or other deaf persons around her to communicate with her as to her needs on a daily basis.
 

 “After coming to the attention of the Montgomery County Juvenile Court, the Montgomery County Multi-Needs Team
 
 *44
 
 met to consider the multiple needs of this deaf child. The County recommendation made to the State Multi-Needs Team was that the child be placed at the National Deaf Academy in Mt. Dora, Florida, hereinafter referred to as NDA. For reasons known only to the State Multi-Needs Team, the executive director, Donna Glass, determined that [D.R.S.] should be sent to University of Alabama at Birmingham Children’s Hospital for a physical examination instead of NDA. After a hearing regarding the best interest and safety of [D.R.S.], Montgomery County Department of Human Resources made the decision to send [D.R.S.] to NDA and to pay for that facility for only 30 days. That specific placement was certainly in this child’s best interest because NDA is a fully licensed medical and educational facility wherein deaf children with multiple needs (such as mental illness, mental retardation, medical problems and the like) may be cared for and may interact with other children who are also hearing impaired and who have educational and medical needs as well.
 

 “At some point in this process, State DHR, through its attorney, James Long, unilaterally removed [D.R.S.] from NDA, transporting her to a facility called BayPointe Hospital in Mobile. At all times pertinent, Mr. Long asserted that State DHR had absolute authority to place any child in DHR custody anywhere it wished without oversight by any authority including the Circuit Court and without answering to any agency or Court for any harm perpetrated upon the child. At the conclusion of the two-day hearing, in response to the Guardian ad Litem, Mr. Long stated on the record, in substance that, ‘I’m the State of Alabama; I say where she goes, and she’s coming back to Alabama.’ Mr. Long continued by telling the Guardian ad Litem and the Court that, if [D.R.S.] were Ordered to NDA, someone other than DHR would have to pay for it.
 

 “The testimony during the two-day trial can only be described as a horror story. Olivia Nettles, Director of the 94-bed hospital at BayPointe, testified that BayPointe had no deaf interpreters on staff, no employees who were available twenty-four hours a day seven days a week and who were fluent in American Sign Language. Ms. Nettles stated that BayPointe had never provided services, including medical attention, for a single deaf child prior to [D.R.S.’s] placement. Ms. Nettles admitted that she was not familiar with the protocols endorsed by the State Depai'tment of Mental Health regarding deaf children. Therefore, she was unsure as to whether or not BayPointe was in compliance with those protocols, which included procedures for restraining a deaf child and for communication with the deaf child. Consistent with her lack of knowledge, Ms. Nettles stated that she had approved the BayPointe staff to provide ‘dry erase boards’ for [D.R.S.] to communicate with staff rather than bear the cost of sign language interpreters. Cross-examination revealed that [D.R.S.] cannot write on the dry erase board when she is upset and her arms are restrained. The Guardian ad Litem posited that, ‘because you understand a deaf person, it should not be assumed that the deaf person understands you.’ Ms. Nettles responded that she had heard that. However she continued to assert that BayPointe was effectively communicating with [D.R.S.].
 

 “Ms. Nettles confirmed that Bay-Pointe was administering a high dosage of amphetamines to [D.R.S.] to such an extent that she tested positive for benzo-diazepine and amphetamines. However,
 
 *45
 
 the staff physician for BayPointe as well as other on-site staff appeared baffled by the positive drug screen and could not explain why this child would have tested positive for amphetamines. The Court took note that clearly, the child is being over-medicated by the physicians and staff at BayPointe for reasons known only to BayPointe. The positive drug screen conducted by Drug Test Services in Montgomery confirmed the over-medication.
 

 “Of particular concern to the Court was an incident which occurred the day before the hearing in Montgomery. The staff at BayPointe had injured [D.R.S.] while again attempting to restrain her. The BayPointe staff ‘busted’ [D.R.S.’s] lip, yet they did not report the injury to the case worker on staff, the physician or the Guardian ad Litem. Ms. Nettles confirmed that BayPointe doesn’t always prepare written reports concerning injuries. The Court is particularly concerned about the injuries this child has sustained which have gone untreated by BayPointe because [D.R.S.] is diabetic. An injury left untreated can have major medical consequences for the diabetic. It was clear that in this incident, [D.R.S.] had been improperly restrained by BayPointe staff so as to render the deaf, diabetic, mentally ill and mentally retarded child unable to communicate, leaving the child, no doubt, terrified in her virtually silent world.
 

 “During the course of the hearing, several BayPointe staff members testified, including Carla Ladnier, who is the assistant coordinator of residential programs at BayPointe. She admitted that she had gotten one week’s notice that she would be a mental health therapist for [D.R.S.]. She does not sign, is not hearing-impaired and is not familiar with needs of deaf children. Also, she stated that she does not know protocols for providing such specialized therapy. Her therapy for [D.R.S.] consists of 30 minutes to an hour per week, in which she focuses on [D.R.S.’s] acting-out, angry behavior. Ms. Ladnier admitted that she was present for the very first restraint of [D.R.S.] on August 6, 2007, as was a staff member, Anita Cox, who is also not hearing impaired, but who has some knowledge of signing.
 

 “There was testimony throughout the hearing regarding numerous restraints of [D.R.S.], all of which rendered her unable to communicate even by dry erase boards and caused injuries to her associated with those restraints.
 

 “One of these injuries occurred when [D.R.S.] was improperly restrained and collided with a trash can, which broke the skin on her leg. Once again the injury was left untreated by BayPointe, causing massive infection to develop. Such a course of action by BayPointe can only be described as medical neglect and abuse for this diabetic, deaf child. Subsequent to the hearing, the Guardian ad Litem filed BayPointe case notes and reports with this Court which indicate that they (BayPointe) are continuing to restrain [D.R.S.] in such a manner as to continue to cause injury to her. Bay-Pointe cannot be considered an appropriate placement for [D.R.S.] under these circumstances. The professionals involved with [D.R.S.] including Liz Hill, the Guardian ad Litem, the probation officer and the Montgomery County Multi-Needs team advised DHR and James Long that BayPointe was inappropriate prior to Mr. Long’s unilateral decision to place [D.R.S.] at BayPointe. Where the health, well-being and life of a child are at issue, ill-informed, power plays by government attorneys cannot be allowed.
 

 
 *46
 
 “The Mobile School for the Deaf refuses to accept [D.R.S.] as a student and made such a determination based on unspecified documents provided to them by BayPointe. The Mobile school indicated that they believed [D.R.S.’s] behavior was not stabilized as she had determined from the level she had reached at NDA. At the time of the hearing, [D.R.S.’s] educational status was abysmal, little having been provided to her by BayPointe.
 

 “BayPointe utilizes a ‘point system’ wherein a ‘consumer’ (resident) earn points which allow the child to be taken outside BayPointe for outings to parks or a mall or a pet store. BayPointe terms such outings to be ‘therapeutic outings.’ [D.R.S.] has had one therapeutic outing to Wal-Mart because she has not earned points for additional outings. Further, [D.R.S.] is required to earn an outing even to interact with other deaf children, which also has not been allowed as of the date of the hearing. Therefore the status of the child, [D.R.S.], is isolation from the deaf community and with no recourse while she is in the custody of DHR. The Court finds it frightening that the agents of DHR find nothing amiss or cause for alarm in BayPointe’s treatment of this child and condones same.
 

 “Ms. Olivia Nettles testified that she really had no direct knowledge of [D.R.S.’s] care, nor did her schedule and duties allow time to oversee care of all of the patients which she refers to as ‘consumers.’ She then asserted that [D.R.S.] likes to sleep and doesn’t want to get up in the morning. When [D.R.S.] doesn’t get up, BayPointe employees punish and restrain her. When asked about the level of [D.R.S.’s] medications and the side effects which are known to induce sleepiness, Ms. Nettles, Director of BayPointe operations, was uninformed as to the side effects of each of the medications prescribed for the child at BayPointe.
 

 “Gregory Broadnax is an LPN at BayPointe. He testified that [D.R.S.] is prescribed Cymbalta, Dulcolax, Depa-kote, Loratadine, Ranitidine, Geodon, Amaryl, Lorazepam, Ativan, Reglan, Metformin and others. All these medications are given to [D.R.S.] on a daily basis. The side effects of Cymbalta are drowsiness, dizziness, headaches, sleep problems, dizziness [sic], hypotension. He also testified that Loratadine, which is Claritin, can cause hallucinations in combination with other medications. Lorazepam, likewise, will cause drowsiness, as will the drug Geodon. Based on comparison with the medications prescribed and administered to [D.R.S.] at NDA, it appears that BayPointe and its personnel over-medicate [D.R.S.] and then punish her when she cannot respond because of the medications they administer to her.
 

 “Another concern is that BayPointe apparently believes that depriving [D.R.S.] of food will stabilize her diabetic condition. There was testimony that [D.R.S.] has Type II diabetes and is insulin dependent. Testimony indicated that a patient who is stable on insulin can eat favorite foods on occasion but in smaller portions. NDA managed [D.R.S.’s] diabetes while providing her with occasional small portions of her favorite foods such as hamburgers and potato chips. BayPointe prefers to simply deprive [D.R.S.] of even small portions of favorite foods. [D.R.S.’s] response to the constant deprivation is to engage in acting-out behavior.
 

 “By comparison, when [D.R.S.] was at the National Deaf Academy in Mt. Dora, she was less medicated and was able to interact with other deaf children on a
 
 *47
 
 daily basis. There was no earned points system at NDA, as outings for the children were considered positive experiences. The administrators and medical personnel, as well as the educational staff at NDA, are all fluent in American Sign Language, and many of those employees are also deaf. NDA personnel were clearly able to understand [D.R.S.’s] needs and to communicate directly with her regarding those needs. In addition, they are able to communicate with her to explain treatment procedures and reasons therefor. The opposite occurred at BayPointe. While placed at the National Deaf Academy, [D.R.S.] was prescribed 500 milligrams of Depakote at bedtime only. At Bay-Pointe, [D.R.S.] was prescribed 1500 milligrams twice daily. The amounts of medications prescribed for [D.R.S.] across the board at National Deaf Academy were far less than the amount prescribed for her by BayPointe personnel.
 

 “Following her placement at NDA, [D.R.S.] undement a full physical examination and psychological evaluation. [D.R.S.’s] behavior stabilized within the thirty (30) days she was at NDA and she appeared to be well-adjusted. She was beginning to adjust to her educational structure and responding to therapy when she was summarily removed from NDA at the insistence of DHR attorney James Long and placed at BayPointe. Mental health therapist Liz Hill testified that the practice of ‘earning outings’ employed by BayPointe is therapeutically destructive. Ms. Hill is a deaf therapist who is fluent in American Sign Language and had made excellent progress with [D.R.S.] in terms of communication and had gained [D.R.S.’s] trust. Ms. Hill is employed with the Alabama Department of Mental Health and Mental Retardation and is in the ideal position to make a therapeutic recommendation for [D.R.S.]. Based on Ms. Hill’s work with deaf children throughout Alabama she testified that there is no program in the State of Alabama for multi-needs deaf children which will provide the continuum of services that NDA provides. It is unfortunate that the State of Alabama does not have such a facility, but the fact remains, that Alabama does not have a facility to accommodate the multiple needs of a child such as [D.R.S.]. Ms. Hill testified that based upon her interaction with [D.R.S.] over a period of time, the child needs to be in a facility where the staff are trained to work with deaf children who are emotionally disturbed, like [D.R.S.]. She recommends that [D.R.S.] be placed at NDA or a comparable facility where [D.R.S.] will be in the best position to progress and become behaviorally stable. It appears that NDA is the closest such facility to Montgomery County geographically.
 

 “Ms. Hill points to an incident wherein BayPointe employees punished [D.R.S.] because one of their non-fluent interpreters for the deaf misunderstood a sign which [D.R.S.] made in an effort to communicate with them. She also testified that, based on the protocols prepared by the Alabama Mental Health Office of Deaf Services regarding restraints, BayPointe’s use of restraints regarding [D.R.S.] was improper and not consistent with those protocols. BayPointe’s restraints render [D.R.S.] unable to communicate as her hands are bound. Of particular concern in the case of [D.R.S.] is the fact that, in mental health therapy, having a third person in the room to interpret, through sign language, patient and therapist communication destroys the dynamics of therapy. It is no longer one-on-one, as it should be. Thus a therapist who if fully
 
 *48
 
 fluent in American Sign Language is required and is the right of the child.
 

 “Donna Glass, director of the State Multi-Needs Office, testified that she believes BayPointe is more appropriate than NDA for [D.R.S.]. It should be noted that Donna Glass was not present for the testimony of the BayPointe personnel who admitted that they have no services for deaf children and have never provided services for a child like [D.R.S.] and, therefore, have no programs or protocols in place to insure the child’s development, stability and safety. It is unknown why Ms. Glass and the State Multi-Needs Team has consistently supported the Department of Human Resources’ baseless position that Bay-Pointe is an appropriate placement for [D.R.S.], particularly when the Montgomery County Multi-Needs Team recommended placement of this child at NDA. The inconsistent opinions are troubling and are cause for concern when weighed with the child’s needs. Also troubling, Ms. Glass demonstrated a marked lack of understanding for a child with [D.R.S.’s] special multiple needs, as Ms. Glass is woefully unaware of what services BayPointe can and does provide and she was completely unaware of the lack of resources at BayPointe for a deaf child. Ms. Glass’s testimony was less than credible.
 

 “Subsequent to the two-day hearing, the Court has reviewed records from BayPointe dated 10/10/07 which were delivered to the Guardian ad Litem and filed with the Court. The BayPointe staff state that [D.R.S.’s] behavior has deteriorated over the last month, that her hearing is getting worse and that she has been prescribed the ‘wrong medicine,’ Ms. Ladnier says in her report,
 

 “ ‘Cons [consumer] has reported feeling lonely at BayPointe, wants to be with other deaf peers, feels isolated from hearing staff members and hearing peers. Although consumer initially seems to be adjusting to BayPointe and connecting with her therapist, at present time consumer is withdrawing from others and has shown a decrease in her participation during therapy. She was observed to have experienced anxiety related to several controversial meetings in Montgomery and aggressive behaviors toward self and others significantly intensified. Discussed the Guardian ad Litem’s and probation officer’s opposition to her placement at BayPointe. Initial outbursts at BayPointe were related primarily to food issues and program rules (consistent with her history), current frustration now seem[s] to be related to uncertainty about her placement. She seems to have lost trust in staff and states that the Court plans to send her back to NDA. Consumer is no longer interested in treatment, may not be successful at BayPointe due to these circumstances. We discussed making recommendation to seek alternative placement for cons at a facility with other deaf peers. She will require same level of care.’
 

 “It is signed Carla Ladnier.
 

 “On October 9, 2007, Ms. Ladnier wrote in [D.R.S.’s] chart that it is not in the child’s best interest to continue treatment at BayPointe and she would be better served in a different residential program. Ms. Ladnier instructed Ms. Ferrere to send a letter to DHR regarding
 
 their
 
 recommendation....
 

 “Alabama State Department of Human Resources and the State Multi-Needs Team have attempted to paint a picture of the National Deaf Academy as being prohibitively expensive in order to justify their decision to place this child
 
 *49
 
 at BayPointe. There was testimony that the cost for NDA is approximately $525 per day. The cost per day for placement at BayPointe is approximately $435 per day. The Court does not find the difference in this cost to be particularly significant, particularly in light of the fact that the State Multi-Needs Team has, throughout the recent past, placed numerous children who are hearing impaired with special needs at the National Deaf Academy. There was testimony that there presently are two such children from the State of Alabama placed at NDA.
 

 “Clearly, all those involved with [D.R.S.] know full well that BayPointe is not equivalent to the National Deaf Academy and BayPointe employees admit that BayPointe cannot provide services for [D.R.S.]. Despite this admission, DHR has consistently attempted to paint the services at BayPointe as equivalent, but they are not. Ms. Hill had predicted that [D.R.S.] would deteriorate at BayPointe, and such has been the case. Based on DHR’s protocols and Alabama statutes, if a natural parent placed a child in a facility such as BayPointe under these same facts and circumstances, DHR would likely seek custody of the child with abuse and neglect charges brought against that parent. In this- case, it is DHR who is the custodial ‘parent’ and who has intentionally left [D.R.S.] in a facility were she is harmed and continues to deteriorate in this inappropriate placement. Under these circumstances, this Court must intervene to protect [D.R.S.].
 

 “Based on the foregoing, a review of the record, the testimony and the exhibits, it is hereby ordered as follows:
 

 “1. That the Court specifically finds that the Alabama Department of Human Resources has not made reasonable efforts to assure the health, safety and educational and medical needs of [D.R.S.] by placing her at BayPointe. Despite DHR’s assertion that this Court cannot tell DHR where to place a child, the Court believes that when DHR fails or refuses to protect a child from harm or mistreatment, the Circuit Court must step in to stop the continued medical maltreatment, over-medication and personal violations of [D.R.S.].
 

 “2. That [D.R.S.] shall be immediately transported to Mt. Dora, Florida, to the National Deaf Academy (or other facility equivalent to the National Deaf Academy), where she shall remain at the expense of the State of Alabama until such time as she is able to function and communicate independently; it is undisputed that presently Alabama has no such facility within its borders.
 

 “3. That copies of any and all records pertaining to [D.R.S.] shall be regularly provided to the Guardian ad Li-tem and [D.R.S.’s] Montgomery County Juvenile probation officer.
 

 “4. That based on the recommendation of the probation officer, [D.R.S.’s] probation is hereby extended for one year.
 

 “5. That probation officer Fred Vrgora shall be available to transport [D.R.S.] from BayPointe to Mt. Dora, Florida, or equivalent facility. The Guardian ad Litem may assist if her schedule permits.
 

 “6. That Mr. Vrgora and the Guardian ad Litem shall monitor [D.R.S.’s] placement at NDA or equivalent facility and notify the Court and DHR as to progress or lack thereof.
 

 “7. That the Court Orders that Mrs. Liz Hill be reinstated as therapist for [D.R.S.] by the Department of Mental Health, so as to allow her to continue her work with this multi-needs child.
 
 *50
 
 Ms. Hill had clearly made progress and has achieved a level of trust which cannot be duplicated quickly. It cannot be in this child’s best interest to have Ms. Hill summarily removed from interaction with [D.R.S.].
 

 “8. That based upon testimony from BayPointe personnel regarding improper restraints and continued injuries to this deaf, diabetic child, together with their recent case notes, it appears that BayPointe has communicated with the Department of Human Resources to remove [D.R.S.] in an effort to minimize their liability. The Court believes, as previously stated, that immediate removal of this child from this improper placement is necessary as Ordered herein.
 

 “9. That all Orders not modified herein remain in full force and effect.
 

 “10. That the Clerk shall transmit a copy of this Order to counsel and/or the parties.”
 

 DHR then requested that the court reporter who recorded the hearing provide DHR with a transcript of the evidentiary hearing; however, the court reporter informed DHR that it would have to obtain a court order authorizing the court reporter to provide it with a transcript. Accordingly, DHR moved the juvenile court to authorize the court reporter to provide it with a transcript; the juvenile court denied DHR’s motion.
 

 DHR filed a petition for a writ of mandamus to the Court of Civil Appeals, seeking to have the November 13, 2007, order vacated insofar as it directed (1) that D.R.S. be removed from BayPointe and placed at the NDA or at an equivalent facility; (2) that the State of Alabama pay the cost of placing D.R.S. at the NDA; and (3) that Liz Hill, a DMH employee, be reinstated as D.R.S.’s therapist. DHR also sought to have the juvenile court’s order denying it a transcript of the eviden-tiary hearing vacated. The Court of Civil Appeals granted the petition in part and denied it in part.
 
 Ex parte Montgomery County Dep’t of Human Res.,
 
 10 So.3d 31 (Ala.Civ.App.2008).
 

 First, the Court of Civil Appeals held that DHR did establish its right to a writ of mandamus directing the juvenile court to vacate its November 13, 2007, order insofar as the order required the State to pay the expense of placing D.R.S. at the NDA. Section 12-15-10, Ala. Code 1975, a part of the Alabama Juvenile Justice Act designates the county as the
 
 entity
 
 responsible for maintenance and care of a juvenile. The Court of Civil Appeals noted that in
 
 Ex parte Department of Mental Health,
 
 511 So.2d 181 (Ala.1987), this Court held that an order of the Houston Juvenile Court directing DMH to place a child at Charter Woods Hospital, a jDrivate facility, for a psychiatric evaluation to be paid for by DMH violated § 12-15-10 and the separation-of-powers provisions of the Alabama Constitution of 1901. 10 So.3d at 35-36.
 

 Second, the Court of Civil Appeals held that DHR was not entitled to a writ of mandamus directing the juvenile court to vacate its November 13 order insofar as the order required that D.R:S. be placed at the NDA and that Liz Hill, a DMH employee, be reinstated as her therapist. The Court of Civil Appeals cited
 
 In re Morris,
 
 491 So.2d 244 (Ala.Civ.App.1986), in which the juvenile court ordered that the child in need of supervision be placed in a facility operated by the State DHR and further ordered that under no circumstances was the child to be sent to another facility, to be placed for a visit, or to be released without the express written consent of the court. The State DHR appealed, arguing that the juvenile court had
 
 *51
 
 overstepped its constitutional authority by adding those three conditions. The
 
 Morns
 
 court held that the State DHR had been empowered with discretion to deal with troubled children in a professional manner and that the juvenile court was authorized to commit mentally disturbed children to the care of the State DHR. However, the juvenile court was not authorized to tell the State DHR how to exercise that discretion, and there had been no allegations that the State DHR had abused, neglected, or improperly treated the child in
 
 Morris.
 
 The juvenile court’s instruction that the State DHR could not take any action without its prior written approval invaded the State DHR’s exercise of its discretion. “ ‘We are not to be understood as holding that the juvenile court cannot review actions taken by the Department in treatment and care of mentally disturbed children committed to its care. All we are saying is that the Department must be given an opportunity to carry out its legislative mandate.’ ”
 
 Ex parte Montgomery County Dep’t of Human Res.,
 
 10 So.3d at 38 (quoting
 
 Morris,
 
 491 So.2d at 246). The Court of Civil Appeals noted that
 
 Morris
 
 was distinguishable because in the present case the juvenile court did not dictate to DHR how it was to care for D.R.S. without first giving DHR the opportunity to carry out its legislative mandate. The court also noted that a juvenile court has the authority to review a State agency’s care of a child committed to its custody and to direct the agency to change the child’s care if the court determines that the care the child is receiving is not in the child’s best interest.
 

 Third, the Court of Civil Appeals held that DHR was entitled to a writ of mandamus ordering the juvenile court to vacate its order denying it a transcript of the evidentiary hearing. Rule 20(B), Ala. R. Juv. P., provides that testimony from a juvenile court shall be transcribed upon order of the court or upon the request of any party at the requesting party’s expense. DHR filed a motion requesting that the testimony from the evidentiary hearing be transcribed and quoted Rule 20(B), Ala. R. Juv. P. The juvenile court denied DHR’s motion because DHR did not expressly offer to pay for the transcript. However, DHR did quote from Rule 20(B), implying that it was willing to comply with the rule. Accordingly, the Court of Civil Appeals directed the juvenile court to vacate its order denying DHR a transcript of the evidentiary hearing.
 

 In their petition to this Court, DHR and DMH ask this Court to issue a writ of certiorari to direct the Montgomery Circuit Court and the Court of Civil Appeals to send up the record, including the transcript of the evidentiary hearing, so that this Court may have the full record to review the important constitutional separation-of-powers issue presented by this case. DHR and DMH ask that a writ of mandamus or other order “upon statutory[
 
 1
 
 ] or common law certiorari review be issued to the Court of Civil Appeals reversing the court’s May 23, 2008, opinion affirming [sic] the Montgomery County Circuit Court Order directing that D.R.S. be placed at [the NDA or equivalent facili
 
 *52
 
 ty] and directing that state employee Liz Hill be reassigned to the case by the Department of Mental Health and Mental Retardation as therapist because the order exceeds the authority of the Court and violates Separation-of-Powers under the Alabama Constitution.” DHR and DMH argue that the transcript of the evidentiary hearing and the record will show that they were attempting to create an in-state program for deaf children with mental-health problems and that D.R.S. was receiving a full array of services at BayPointe. They contend that this Court should issue a writ of “certiorari to bring up the entire record in order to make a fully informed decision regarding the separation-of-powers and the boundaries of judicial discretion.” It appears that DHR and DMH are asking this Court to issue a writ of certiorari to have the record and the transcript from the evidentiary hearing reviewed by this Court in order that it can then determine whether the Court of Civil Appeals erred in denying DHR and DMH’s petition for the writ of mandamus as to certain portions of the juvenile court’s order.
 

 Discussion
 

 DHR and DMH cite
 
 Max J. Winkler Brokerage, Co. v. Courson,
 
 160 Ala. 374, 49 So. 341 (1909), for the proposition that this Court could issue a common-law writ of certiorari in order to review the entire record because, they argue, a writ of certiorari is issued by a superior court to an inferior court to bring up the record and to determine whether the judgment of the inferior court was erroneous. In that case, the petition for a common-law writ of certiorari was filed in the circuit court, seeking to have the proceedings in an inferior court certified. They cite but do not discuss
 
 Ex parte Hennies,
 
 33 Ala.App. 377, 34 So.2d 22 (1948), which involved a common-law writ of certiorari to review the record of the Jefferson County Court of Misdemeanors in a contempt action. DHR and DMH quote from, but do not discuss,
 
 Nashville Chattanooga & St. Louis Ry. v. Town of Boaz,
 
 226 Ala. 441, 443, 147 So. 195, 196 (1933). In that case, this Court stated: “The remedy by common-law cer-tiorari only extends to courts or boards required by law to keep a record or quasi record of their proceedings, and the only proper return to the writ is such record or a transcript thereof duly authenticated by the legal custodian, as it exists at the time of the issuance of the writ.” In short, these three cases hold that when an inferi- or court has acted based on the information before it, a superior court could review the inferior court’s judgment in light of the same information that was before the inferior court.
 

 In the present case, the Court of Civil Appeals would have original jurisdiction over an appeal regarding D.R.S., and that court would also have original jurisdiction of a petition for a writ of mandamus relating to a matter over which it would have appellate jurisdiction. § 12-3-11, Ala.Code 1975. In granting in part and denying in part DHR and DMH’s petition for the writ of mandamus, the Court of Civil Appeals reached the merits of the case without the benefit of the same information that was before the juvenile court. DHR and DMH ask this Court to review the merits of the Court of Civil Appeals’ decision with the benefit of information that was never before the Court of Civil Appeals. By their petition for a writ of certiorari or the petition for a writ of mandamus DHR and DMH can seek review of only the decision of the Court of Civil Appeals, not the decision of the juvenile court.
 

 DHR and DMH have not complained, and could not complain, that the Court of Civil Appeals erred in entertaining then' mandamus petition without the
 
 *53
 
 transcript from the hearing in the juvenile court.
 
 [2]
 
 In other words, DHR and DMH have not asked this Court to issue a writ of mandamus ordering the Court of Civil Appeals to review the merits of the juvenile court’s decision in light of the transcript. Instead, they ask this Court to review the Court of Civil Appeals’ disposition of the merits of the case, in light of the transcript of the evidentiary hearing, which was not before the Court of Civil Appeals. Absent any argument that the Court of Civil Appeals erred in reaching the merits without the transcript, there is no need for this Court to review the transcript, and any issue surrounding the necessity for a transcript has been waived. When a petitioner fails to argue an issue in his brief, that issue is waived. See
 
 Ex parte Martin,
 
 775 So.2d 202, 206 (Ala.2000).
 

 Even if DHR and DMH had not waived the issue regarding the necessity of the transcript, the cases concerning a common-law writ of certiorari have to do with the interaction between an inferior court from which an appeal lies to a superior court. As discussed earlier, this Court’s review of the decisions of tribunals from which an appeal lies to the Court of Civil Appeals is limited, and we will not expand the broad language in eases such as
 
 Max J. Winkler Brokerage
 
 beyond the context in which the rule regarding common-law writs of certiorari is stated.
 

 Regarding the mandamus petition, DHR and DMH have not shown that they have a clear legal right to the relief sought because they waived any argument regarding the Court of Civil Appeals’ review of the juvenile court’s order, and this Court is limited in its appellate jurisdiction to reviewing the Court of Civil Appeals’ actions or misdeeds, not those of the trial court.
 

 Based on the foregoing, DHR and DMH’s petition seeking either a common-law or statutory writ of certiorari or a writ of mandamus is denied.
 

 PETITION DENIED.
 

 COBB, C.J., and LYONS, STUART, and MURDOCK, JJ„ concur.
 

 [1]
 

 . Although DHR and DMH ask for a "statutory writ of certiorari," they do not cite any authority regarding a statutory writ of certio-rari nor do they explain how such a writ would apply in this case. Historically, the purpose of a statutory writ of certiorari was to secure review by trial de novo in the circuit court after the right of appeal was lost, and it existed as the result of the interaction of several statutory provisions that the legislature did not carry forward into the Code of Alabama 1975. See
 
 Norton v. Staples,
 
 377 So.2d 1095 (Ala.Civ.App.1979).
 

 [2]
 

 . Part of the relief DHR sought, and received, in the Court of Civil Appeals was a writ ordering the juvenile court to vacate its order denying DHR a transcript of the evidentiary hearing.